IN RE INTEREST OF DALTON S., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
DALTON·S., APPELLANT.

730 N.W.2d 816

Filed May 4, 2007.    No. S-06-742.

Terry L. Haddock, of Raynor, Rensch & Pfeiffer, and William J. Neiman for appellant.

Sandra Allen, Deputy Platte County Attorney, for appellee.

Jason D. Mielak, of Fehringer, Mielak & Fehringer, P.C., L.L.O., guardian ad litem for Dalton S.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## NATURE OF CASE

Following a dispositional hearing, Dalton S., represented at the dispositional hearing by counsel and a guardian ad litem (GAL), was placed in the custody of the Nebraska Department of Health and Human Services, Office of Juvenile Services (OJS), in a treatment foster home. Dalton asserts that the court erred in placing him outside his uncle's home, where he had been residing, without a written determination expressly finding that continuation in the home would be contrary to Dalton's health, safety, or welfare and that reasonable efforts to preserve and unify the family had been made. Dalton's main contention, however, is that he did not intelligently, voluntarily, and understandingly waive his right to counsel in a previous adjudication hearing which placed Dalton under the juvenile court's jurisdiction pursuant to Neb. Rev. Stat. § 43-247(1) (Reissue 2004).

## BACKGROUND

Dalton, born May 24, 1995, has been diagnosed as being mildly mentally handicapped and suffering from bipolar disorder, attention deficit disorder, and posttraumatic stress syndrome. On March 22, 2005, the Deputy Platte County Attorney filed a petition in the juvenile court alleging that Dalton had violated a city ordinance prohibiting disorderly conduct and was a juvenile within the meaning of § 43-247(1). The allegation stemmed from an incident at an elementary school in which Dalton allegedly hit another student and then knocked over some chairs. Although the county attorney had informed Dalton's parents that he would likely be eligible for diversion because he had no prior convictions or adjudications, this option was apparently not pursued.

A hearing on the petition was conducted on April 4, 2005. Dalton was present with his mother. He was not represented by an attorney or a GAL at that time. The court informed Dalton

of what he was being charged with and explained that if the allegations were found to be true, then the juvenile court would have jurisdiction over him to enter any order in his best interests. The court explained that such an order could range from "just telling you don't do this again to placing you under some level of supervision by a probation officer." The court further explained:

> There are certain cases where children can be removed from home and placed in public or private institutions for their care. That can include hospitals, treatment centers, group or foster homes, places like Girls and Boys Town of Omaha and the like. And if there aren't any other resources available to a juvenile court, a child can be placed in the custody of [OJS] for commitment to the Youth Rehabilitation and Treatment Center in Kearney, Nebraska for boys. The law further provides that rehabilitation of juveniles take place in their own home whenever possible and removal from home is only allowed in cases where a successful rehabilitation cannot be accomplished at home.

Dalton affirmed that he understood the possible consequences of being adjudicated to be under the jurisdiction of the juvenile court.

The court then continued to inform Dalton of his right that the charge against him be proved beyond a reasonable doubt. The court explained his right to confront witnesses, which the court explained meant "to see and hear and ask questions of any witness that the State calls." The court explained to Dalton that he had a right to present witnesses and to subpoena witnesses if they were unwilling to come voluntarily. The court explained that "a subpoena is nothing more than an order that's entered by a Court directed to a particular person and tells that person that they have to come to court and testify." The court informed Dalton of his right to remain silent and the consequences of choosing to testify or remain silent. The court explained Dalton's right to a speedy trial and his right to appeal if he was dissatisfied with the court's judgment. Dalton affirmed that he understood all these rights.

Finally, the court explained to Dalton his right to counsel:

[Y]ou have a right to be represented by an attorney at every stage of the proceedings. You and your family would be free to hire an attorney of your choice or if you wish to be represented by counsel, and your family doesn't have enough money to go out and hire an attorney right now, you can ask the Court to appoint an attorney for you at the public expense. To be considered for a court appointed attorney, your family would have to complete a financial affidavit so I can determine whether or not you meet the current guidelines of the Court for appointed counsel. On the other hand, you can waive or give up your right to have an attorney and just go ahead today with your mother. Did you want to have a lawyer represent you in this court?

Dalton's mother told Dalton, "You don't need a lawyer. Say no. Say it." Dalton responded, "No." The court again asked, "You understood that right and you're telling me that you just want to go ahead with your mom today and not have a lawyer here, is that right?" Dalton's mother and Dalton responded, in turn, affirmatively. The court then addressed Dalton's mother more directly, "Is that all right with you, ma'am, that we'd proceed today . . . without counsel?" Dalton's mother responded that it was.

The court found that "the child with the concurrence of his mother freely, voluntarily and knowingly waives his right to counsel." The court then explained the rules of pleading and explained in detail the meaning and consequences of pleading guilty. Dalton affirmed that he understood, and more questions were presented by the court to determine the voluntariness of Dalton's plea.

The court accepted Dalton's admission that he committed the offense of disorderly conduct on February 24, 2005. A factual basis for the petition was presented to the court, which the court accepted. The court adjudicated Dalton to be within § 43-247(1), but deferred disposition until a predisposition study could be conducted. In the meantime, Dalton was to continue living with his mother.

On June 13, 2005, Dalton and his mother again appeared before the juvenile court. Dalton still did not have an attorney at that time. After a short discussion with the mother and Dalton,

the court continued disposition until further assessments could be conducted.

On July 25, 2005, Dalton appeared before the court with his mother, his grandfather, and his uncle. Also present was an attorney who was appearing as Dalton's court-appointed GAL. The court again continued disposition in order to complete a psychological assessment that was underway.

Another hearing was conducted on October 31, 2005, in which disposition was again continued, this time at the request of Dalton, through the GAL. The GAL explained that Dalton had been living with his uncle, who was present at the hearing, and that although Dalton's mother was not present that day, it was expected that she would consent to the nomination of Dalton's uncle as his guardian. The evidence indicated that Dalton's mother had a live-in boyfriend who was physically abusive toward both Dalton and his mother but that at some point, she had discontinued the relationship. There was also evidence that Dalton's mother had a drinking problem. Dalton's mother voluntarily placed Dalton with his uncle because she was having trouble coping with Dalton's behaviors at home.

On December 12, 2005, the juvenile court held another hearing in which Dalton, the GAL, Dalton's mother, and Dalton's uncle were present. Pursuant to the GAL's request and with Dalton's mother's consent, the court issued a temporary order naming Dalton's uncle as his guardian. The matter of permanent guardianship and further disposition was set for hearing on February 6, 2006.

On February 6, 2006, a short hearing was held which was attended only by Dalton's uncle and the GAL. Dalton's father also appeared and stated his intent to object to the proposed dispositional order prepared by the GAL. Dalton's father explained that he was in the process of acquiring an attorney, and the court granted another continuance. Dalton's father did not appear before the court again.

A hearing was held on March 27, 2006, on the State's request for an OJS evaluation before final disposition. Dalton, his uncle, and the GAL were present at the hearing. The county attorney explained that some events had recently occurred which resulted in the State's no longer wanting to continue

the guardianship of Dalton's uncle. The record indicates that concerns had arisen with respect to Dalton's placement with his uncle because Dalton admitted to two episodes of improper physical sexual contact with his 4-year-old female cousin, the daughter of Dalton's uncle. Dalton's uncle stated that he did not have any objections to the requested evaluation, and the court ordered the evaluation be conducted and continued disposition.

The next hearing before the juvenile court was on June 5, 2006. Dalton was present and, in addition to the GAL, was also represented for the first time by an attorney retained on Dalton's behalf by Dalton's uncle. The court granted a motion by Dalton's attorney for a continuance.

The dispositional hearing was finally conducted on June 19, 2006. Dalton and his uncle were present, as were Dalton's GAL and attorney. The State argued that the OJS evaluation supported its contention that out-of-home treatment would be in Dalton's best interests, as well as in the best interests of the 4-year-old victim. Dalton's attorney, in contrast, argued that Dalton should remain with his uncle as long as a safety plan for Dalton's cousin was in place. Alternatively, the attorney expressed the willingness of Dalton's grandparents to take him in and asked for an investigation to see if the grandparents' home would be an appropriate placement.

A comprehensive child and adolescent assessment conducted by OJS indicated that Dalton's mother was no longer drinking and had ceased her relationship with the abusive boyfriend. She was having supervised visitation with Dalton. Dalton was evaluated as being at least a moderate risk to reoffend against other children. It was noted that there were at least three inappropriate incidents with his cousin, at least one of which was after a safety plan had been implemented to prevent such an incident. Although Dalton's behavior had improved since living with his uncle, the assessment recommended that due to the abuse concerns with Dalton's cousin, Dalton be placed in treatment foster care.

The court found that it would be in Dalton's best interests to be placed in the care, custody, and control of OJS for appropriate residential placement in a treatment foster home. The court noted that the assessments reflected a complex diagnosis for

such a young child, and the court concluded that the number and complexity of the diagnoses mandated "intense treatment" and were "beyond the capability of probably any family to manage." The court also expressed its concern that Dalton and his young victim not be living in the same home and that Dalton be in an environment where "silence is not valued." Dalton timely filed his notice of appeal from the court's dispositional order.

## ASSIGNMENTS OF ERROR

Dalton assigns as error that the juvenile court abused its discretion in accepting Dalton's plea because (1) it failed to adequately advise Dalton of his right to counsel, (2) it failed to conduct a thorough inquiry into Dalton's intelligence or capacity to understand that right, (3) it failed to advise Dalton or his mother of Dalton's right to counsel at every stage of the proceedings, and (4) the totality of the circumstances reflected in the record does not support a finding of waiver.

Dalton also asserts that the juvenile court erred by entering a dispositional order removing Dalton from his uncle's home without making a written determination, as mandated by Neb. Rev. Stat. § 43-284 (Reissue 2004), that continuation in the uncle's home would be contrary to the health, safety, or welfare of Dalton and that reasonable efforts to preserve and unify the family had been made.

## STANDARD OF REVIEW

■ The juvenile court's determination as to whether a juvenile's waiver of counsel was voluntary, knowing, and intelligent is reviewed de novo on the record for an abuse of discretion.[1]

■ As to the issue presented regarding the applicability of § 43-284, this presents a question of law. In reviewing questions of law in cases arising under the Nebraska Juvenile Code, an appellate court reaches a conclusion independent of the lower court's ruling.[2]

---

[1] See *In re Interest of J.K.*, 265 Neb. 253, 656 N.W.2d 253 (2003) (juvenile court's decision regarding appointment of special counsel is reviewed de novo on record for abuse of discretion).

[2] See *In re Interest of Veronica H.*, 272 Neb. 370, 721 N.W.2d 651 (2006).

## ANALYSIS

### WAIVER OF COUNSEL

We first consider Dalton's assertion that he did not intelligently, voluntarily, and understandingly waive his right to counsel in the adjudication hearing which placed Dalton under the juvenile court's jurisdiction pursuant to § 43-247(1).

Dalton does not contest the fact that the juvenile court conducted the colloquy required by statute for informing a juvenile of the right to counsel and for acceptance of a juvenile's plea without counsel.[3] Section 43-272(1) states in relevant part:

> When any juvenile shall be brought without counsel before a juvenile court, the court shall advise such juvenile and his or her parent or guardian of their right to retain counsel and shall inquire of such juvenile and his or her parent or guardian as to whether they desire to retain counsel. The court shall inform such juvenile and his or her parent or guardian of such juvenile's right to counsel at county expense if none of them is able to afford counsel.

Section 43-279(1) provides that the court shall inform the parties of the nature of the proceedings and possible consequences or dispositions, the juvenile's right to counsel, the privilege against self-incrimination, the right to confront witnesses, the right to compel witnesses to testify, the right to a speedy adjudication hearing, the right to appeal, and the right to a transcript for appeal. After giving such warnings and admonitions:

> [T]he court may accept an in-court admission by the juvenile of all or any part of the allegations in the petition if the court has determined from examination of the juvenile and those present that such admission is intelligently, voluntarily, and understandingly made and with an affirmative waiver of rights and that a factual basis for such admission exists.[4]

Dalton asserts that despite conducting the statutory colloquy, the record does not support the juvenile court's determination that Dalton intelligently, voluntarily, and understandingly

---

[3] See Neb. Rev. Stat. §§ 43-272 and 43-279(1) (Reissue 2004).

[4] § 43-279(1).

waived his right to counsel. Dalton correctly points out that the issue of how precisely a juvenile court is to make the determination of whether a juvenile has intelligently, voluntarily, and understandingly waived his or her right to counsel is one of first impression for this court.

The U.S. Supreme Court in *In re Gault*[5] reversed a delinquency determination because the juvenile court did not inform the juvenile or his parents of a right to counsel. The Court in *In re Gault* established that a juvenile in delinquency proceedings which could result in the curtailment of the juvenile's freedom has a due process right to counsel under the 14th Amendment.[6] Dalton argues that his 14th Amendment rights were violated and that thus, the adjudication order and all dispositional orders issued under the jurisdiction acquired by the adjudication order must be vacated. For the reasons that will be explained below, we find that Dalton's due process right to counsel was not violated in this case.

We first address Dalton's argument that he was inadequately informed of his right to counsel. Dalton asserts that in addition to the colloquy set forth by statute, the court must inform of the "dangers and disadvantages of self-representation"[7] in order for its advisement to be sufficient under the 14th Amendment.

In *In re Gault*, the Court explained that it was necessary to adequately inform the juvenile and his mother of the right to counsel regardless of evidence that the mother knew she could have appeared with counsel. The Court explained:

> They had a right expressly to be advised that they might retain counsel and to be confronted with the need for specific consideration of whether they did or did not choose to waive the right. If they were unable to afford to employ counsel, they were entitled in view of the seriousness of the

---

[5] *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967).

[6] See, *In re Interest of J.K., supra* note 1; *In re Interest of Torrey B.*, 6 Neb. App. 658, 577 N.W.2d 310 (1998).

[7] Brief for appellant at 19.

charge and the potential commitment, to appointed counsel, unless they chose waiver.[8]

The concept of being advised of the "dangers and disadvantages of self-representation" is not mentioned in *In re Gault*. That concept is derived from *Faretta v. California*,[9] wherein the Court stated, in the context of an adult criminal defendant's waiver of counsel, that the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" Advising of the dangers and disadvantages of self-representation goes beyond advising of the seriousness of the charge and the potential commitment. It has been said to encompass, more specifically, an explanation of the facts that technical rules govern trials and that a layperson may be at a disadvantage in maneuvering through trial.[10]

However, the U.S. Supreme Court has not "prescribed any formula or script to be read to a defendant."[11] We have held, in the context of an adult criminal defendant, that a specific warning of the dangers and disadvantages of self-representation is not strictly required.[12] A voluntary, knowing, and intelligent waiver of counsel can be found in the absence of a warning if the record viewed as a whole shows such a waiver.[13]

---

[8] *In re Gault, supra* note 5, 387 U.S. at 42.

[9] *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

[10] See, *U.S. v. McDowell*, 814 F.2d 245 (6th Cir. 1987); *People v. Goodwillie*, 147 Cal. App. 4th 695, 54 Cal. Rptr. 3d 601 (2007); *State v. Strain*, 585 So. 2d 540 (La. 1991); *State v. Johnson*, 944 So. 2d 864 (La. App. 2006); *State v. Crisafi*, 128 N.J. 499, 608 A.2d 317 (1992); *State v. Martin*, 103 Ohio St. 3d 385, 816 N.E.2d 227 (2004); *Johnson v. State*, 760 S.W.2d 277 (Tex. Crim. App. 1988).

[11] *Iowa v. Tovar*, 541 U.S. 77, 88, 124 S. Ct. 1379, 158 L. Ed. 2d 209 (2004).

[12] See, *State v. Gunther*, 271 Neb. 874, 716 N.W.2d 691 (2006); *State v. Delgado*, 269 Neb. 141, 690 N.W.2d 787 (2005); *State v. Green*, 238 Neb. 328, 470 N.W.2d 736 (1991).

[13] *State v. Green, supra* note 12.

We decline to adopt a position in the context of juvenile proceedings that would preclude a finding of a knowing and intelligent waiver in the absence of *Faretta* admonishments. Indeed, at least one court has decided that warnings regarding the dangers and disadvantages of self-representation are unneeded in the context of a defendant charged with a misdemeanor offense who does not contest the charge.[14] Many juvenile proceedings, such as the one before us, involve simple matters in which there is no dispute. In such cases, there is little in the way of intricacies of the offense, technical rules of evidence, or rules relating to the examination of witnesses, which would need to be described as dangers and disadvantages of self-representation.

Here, the juvenile court informed Dalton of the seriousness of the charge against him and the potential commitment, as mandated by *In re Gault*. The court stated that it had the power to issue any order in Dalton's best interests. This could include hospitals, treatment centers, and group or foster homes. It is undisputed that the court satisfied the detailed colloquy mandated by statute. We find no reversible error based on an alleged lack of adequate advisement. We now turn to whether the juvenile court abused its discretion in its determination that Dalton understood his right to counsel and knowingly and intelligently waived that right.

■ We hold that whether a juvenile has knowingly, voluntarily, and intelligently waived the right to counsel is to be determined from the totality of the circumstances. We note that because the juvenile in *In re Gault* was never advised of a right to counsel, the court in that case did not specify how that right could be effectively waived. Subsequent cases from other jurisdictions have adopted varying frameworks for this determination, but the most common approach is to consider the totality of the circumstances.[15] We have adopted this approach for determining, in both adult and juvenile contexts, whether there has been an effective waiver of *Miranda* rights.[16] And the totality

[14] *Hatten v. State*, 71 S.W.3d 332 (Tex. Crim. App. 2002).

[15] Annot., 101 A.L.R.5th 351 (2002).

[16] See, e.g., *State v. Garner*, 260 Neb. 41, 614 N.W.2d 319 (2000).

of the circumstances approach, in the *Miranda* context, has been explicitly approved by the U.S. Supreme Court.[17]

■ The circumstances considered in a totality of the circumstances analysis include the age, intelligence, and education of the juvenile[18]; the juvenile's background and experience generally, and more specifically, in the court system[19]; the presence of the juvenile's parents[20]; the language used by the court in describing the juvenile's rights[21]; the juvenile's conduct[22]; the juvenile's emotional stability[23]; and the intricacy of the offense.[24]

■ It is generally accepted that where a juvenile waives his or her right to counsel, the burden lies with the State, by a preponderance of the evidence, to show that the waiver was knowingly, intelligently, and voluntarily made.[25] Courts should take special care in scrutinizing a purported confession or waiver by a child.[26] Courts should also take care to employ language that the juvenile can understand and to take the time necessary to conduct a sufficient inquiry into the juvenile's understanding of the right to counsel and waiver thereof.

---

[17] See *Fare v. Michael C.*, 442 U.S. 707, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979).

[18] See, e.g., *People v Bingaman*, 144 Mich. App. 152, 375 N.W.2d 370 (1984).

[19] See, e.g., *Matter of Maricopa County Juv. Action*, 165 Ariz. 226, 798 P.2d 364 (1990).

[20] See, e.g., *Huff v. K. P.*, 302 N.W.2d 779 (N.D. 1981).

[21] See, e.g., *Sutton v. Mt. Sinai Med. Ctr.*, 102 Ohio App. 3d 641, 657 N.E.2d 808 (1995).

[22] See, e.g., *In re D.L.*, 999 S.W.2d 291 (Mo. App. 1999).

[23] See *In re Johnson*, 106 Ohio App. 3d 38, 665 N.E.2d 247 (1995).

[24] See, e.g., *G.E.F. v. State*, 782 So. 2d 951 (Fla. App. 2001). See, also, generally, Annot., 101 A.L.R.5th, *supra* note 15; 47 Am. Jur. 2d *Juvenile Courts, Etc.* § 87 (2006) (citing cases).

[25] See *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). See, also, *State v. Wilson*, 252 Neb. 637, 564 N.W.2d 241 (1997).

[26] *In re Manuel R.*, 207 Conn. 725, 543 A.2d 719 (1988). See, also, *In re B. M. H.*, 177 Ga. App. 478, 339 S.E.2d 757 (1986).

Here, Dalton was only 9 years old and mildly mentally handicapped. He apparently had no previous experience in court proceedings. But Dalton's mother was present, and she was actively involved in Dalton's waiver.[27] While his mother's involvement would be given little weight if she had a conflict with Dalton's best interests,[28] we are unconvinced by Dalton's assertions that such a conflict of interest existed in this case. The mere fact that Dalton's mother had demonstrated some failings in caring for Dalton or that she did not pursue the diversion offered by the county attorney does not demonstrate a conflict of interest.[29]

Nor do we accept Dalton's contention that for Dalton's mother's acquiescence to be given any weight, the record must affirmatively show a meaningful consultation between them.[30] This apparently would entail, according to Dalton, evidence of a separate colloquy between the mother and Dalton explaining to him the right to counsel. In this case, Dalton and his mother were present together before the court when it gave, in plain language, an explanation of the right to counsel. Dalton and his mother were obviously free to speak to each other during this time. Dalton's mother told Dalton that he did not need a lawyer.

Dalton now points to his mother's statement, "You don't need a lawyer. Say no. Say it," as demonstrating a lack of meaningful consultation. We find this statement inconsequential. Both Dalton and his mother were repeatedly questioned as to whether they understood the right being explained and whether they wished to waive that right. We find the proceedings sufficient

---

[27] See, e.g., *R. V. P. v. State*, 395 So. 2d 291 (Fla. App. 1981); *K. E. S. v. State of Ga.*, 134 Ga. App. 843, 216 S.E.2d 670 (1975); *In re K.H.*, 718 N.W.2d 575 (N.D. 2006); *Huff v. K. P., supra* note 20; *In re A.M.*, 766 A.2d 1263 (Pa. Super. 2001).

[28] See, *In re Shawnn F.*, 34 Cal. App. 4th 184, 40 Cal. Rptr. 2d 263 (1995); *In re Manuel R., supra* note 26.

[29] See *In re Manuel R., supra* note 26.

[30] See, e.g., *Williams v. State*, 433 N.E.2d 769 (Ind. 1982); *State in the Interest of Jones*, 372 So. 2d 779 (La. App. 1979); *Edward C. v. Collings*, 193 Mont. 426, 632 P.2d 325 (1981).

to give weight to Dalton's mother's presence and to her explicit agreement with Dalton's waiver of counsel.

In considering whether Dalton's 14th Amendment right was violated, we also consider the fact that the offense with which Dalton was charged was disorderly conduct in violation of a city ordinance. The record does not reflect any dispute as to the fact that Dalton hit another student and knocked over some chairs one day at school. Moreover, after the adjudication, Dalton made only one other appearance before the court without counsel, when the court simply decided to continue disposition. By the time of the July 25, 2005, appearance, Dalton had been appointed a GAL, who continued to represent his interests throughout the remaining proceedings. By the time of the dispositional hearing, when the issues had grown in complexity, Dalton's interests were represented by both his GAL and retained counsel.

Viewing the totality of the circumstances, we do not find a violation of Dalton's 14th Amendment rights in the juvenile proceedings. We find no error in failing to continually advise Dalton of his right to counsel once he was represented by a GAL, and we find no due process violation in his lack of advisement in a single hearing resulting in a continuance. Nor do we find the court's probing into Dalton's intelligence or capacity constitutionally insufficient under the circumstances of this case. We find no merit to Dalton's assignments of error relating to his waiver of counsel.

### Written Determination Under § 43-284

Dalton also claims that the juvenile court erred in placing Dalton in a treatment foster home without first making a written determination, under § 43-284, that continuation in the home would be contrary to the health, safety, or welfare of the juvenile and that reasonable efforts to preserve and reunify the family had been made.

The State argues that the requirement for such a written finding is not applicable to juveniles who are adjudicated under § 43-247(1). We agree. By its terms, § 43-284 is the statutory provision regarding disposition of juveniles adjudicated under § 43-247(3), (4), or (9). Neb. Rev. Stat. § 43-286 (Reissue 2004), in contrast, is the applicable section on disposition for juveniles

adjudicated under § 43-247(1), (2), or (4). Section 43-286 speaks of placing the juvenile in a suitable institution or committing the juvenile to OJS, but nowhere refers to a finding that continuation in the home would be contrary to the health, safety, or welfare of the juvenile or that reasonable efforts to preserve and reunify the family have been made.

## CONCLUSION

We affirm the judgment of the juvenile court.

AFFIRMED.